## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **LAURA M. COGSWELL,** | ) | Case No.  3:13CV689 |
| | ) | |
| **Plaintiff,** | ) | **JUDGE JAMES G. CARR** |
| | ) | **Magistrate Judge George J. Limbert** |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN** [1]**,** | ) | **REPORT AND RECOMMENDATION** |
| **ACTING COMMISSIONER OF** | ) | **OF MAGISTRATE JUDGE** |
| **SOCIAL SECURITY** | ) | |
| | ) | |
| **Defendant.** | ) | |

Plaintiff Laura M. Cogswell seeks judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("SSA") finding that she experienced medical improvement such that she was no longer entitled to Disability Insurance Benefits ("DIB") as of October of 2007 and she was not entitled to DIB on a separate claim. Electronic Case Filing (ECF) Dkt. #1.  For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the instant case to the ALJ:

## I.      PROCEDURAL HISTORY

On October 5, 2007, the SSA determined that Plaintiff was no longer entitled to DIB beginning in October of 2007.  Tr. at 50, 51.  The SSA indicated that Plaintiff was originally found disabled due to chronic renal failure beginning January 18, 1998[2] but she did not furnish the required

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2] The October 5, 2007 social security notice denying further benefits for Plaintiff indicated that the decision that Plaintiff was originally deemed disabled was January 18, 1998.  Tr. at 51.  However, the DHO Decision indicated that the Planintiff experienced medical improvement since January 7, 1998 the date of the comparison point decision deeming her originally disabled. *Id.* at 59.

information to the SSA in order to help them decide whether she continued to be disabled. *Id.* The SSA also indicated that Plaintiff failed to clarify the information received from medical sources concerning her condition as requested and failed to provide a current condition that prevented her from working. *Id.* Plaintiff filed a request for reconsideration of the cessation of her disability status. Tr. at 54.

On May 13, 2008, a Disability Hearing Officer ("DHO") held a hearing with Plaintiff and her mother present and providing testimony. *Id.* at 59-60.

On June 3, 2008, the DHO issued a decision finding that Plaintiff had experienced medical improvement and despite her severe impairments, she was able to perform light work and was therefore no longer entitled to DIB. Tr. at 67-68. The DHO noted that on January 7, 1998, Plaintiff was found to be disabled for social security purposes as of August 5, 1997 due to renal failure. *Id.* at 61. It was determined that Plaintiff's impairment met Listing 6.02 for renal failure at that time. *Id.* The DHO further found that in December 2007, Plaintiff's disability for social security purposes was determined to have ceased as her condition had improved since the January 7, 1998 decision and she was able to perform substantial work activities. *Id.*

The DHO cited to medical evidence showing that at the time of the January 7, 1998 decision, Plaintiff was diagnosed with Post Streptococcal Glomerulonephritis with hypertension and encephalopathy and this condition gradually improved, as did her kidney function, but she was then diagnosed with IGA Nephropathy and Chronic Glomerulosclerosis and developed a right-sided weakness due to a stroke. Tr. at 61. Plaintiff was thereafter placed on dialysis and on a transplant list. *Id.* The DHO noted that Plaintiff underwent a kidney transplant in 1997. *Id.* The DHO also considered the testimony of Plaintiff and her mother as to her impairments and resulting effects. *Id.* at 61-62. The DHO noted that Plaintiff indicated that her right arm, face and legs go numb, her right

-2-

arm swells and hurts, she is easily fatigued, and on a bad day, she cannot do anything. *Id.* at 61. She tried to do things on good days, such as gardening, getting a shower and doing household chores. *Id.* She reported that she has trouble driving and does not drive alone because she has trouble driving distances. *Id.* She further testified that she was forgetful and wrote things down to help remember. *Id*. She indicated that she was going through a divorce and was very nervous and easily depressed because she could not see her seventeen year-old son. *Id*. at 62. She also reported that she was very irritable, which she attributed to her medication. *Id.*

The DHO found that the medical evidence showed that Plaintiff's kidney function at the time of the DHO's decision was normal and she had not had any rejection episodes. Tr. at 61. The DHO further found that while Plaintiff had chronically been on steroids for her condition, October 7, 2007 testing showed no signs of osteoporosis. *Id*. The DHO also noted that Plaintiff became easily fatigued, developed hard to resolve infections because of the suppression of her immune system. *Id*. Based upon the medical evidence, the DHO found that Plaintiff did not meet or equal Listing 6.02 because she did not have a renal disease that was expected to last for 12 months; she was not on hemodialysis or peritoneal dialysis necessitated by irreversible renal failure; and a kidney transplant had been performed more than 12 months ago. *Id*. at 64.

On June 23, 2008, Plaintiff filed a request for reconsideration of the DHO's Decision and she requested a hearing. Tr. at 70. On May 11, 2009, an ALJ held a video hearing, where Plaintiff was present and represented by counsel. Tr. at 484. Plaintiff presented testimony at the hearing. *Id.*

On June 12, 2009, the ALJ reviewed the medical evidence of record and Plaintiff's testimony and determined that as of October 1, 2007, the date that it was determined that Plaintiff's disability had ended, she had the severe impairments of status-post kidney transplant and chronic headaches secondary to chronic sinusitis. Tr. at 486. The ALJ found that Plaintiff's additional alleged

impairments of right-sided arthalgias, chronic urinary tract infections, history of orthostatic hypotension, hemorrhoids, and left eyebrow lesion were not severe. *Id.* at 486-487. The ALJ found that as of October 1, 2007, Plaintiff did not have an impairment or combination of impairments that met or equaled a Listing and medical improvement occurred as of October 1, 2007 as the impairments present at the time of the comparison point decision had decreased in medical severity such that Plaintiff had the residual functional capacity ("RFC") to perform limited light work activities. *Id.* at 487. While finding that Plaintiff continued to have a severe impairment or combination of impairments as of October 1, 2007, the ALJ found that based upon the impairments present on October 1, 2007, Plaintiff had the RFC to perform light work except that: she could not perform fine dexterous tasks more than occasionally; she was unable to work at a job which requires a great deal of face-to-face interaction with the general public secondary to her weakened immune system; she was unable to perform any job which requires highly complex instructions or tasks, secondary to her occasional sinus headaches. *Id.* at 488-489. The ALJ therefore concluded that beginning on October 1, 2007, Plaintiff had been capable of performing past relevant work as a machine operator and her disability ended as of October 1, 2007. *Id.* at 489-490.

Plaintiff requested review of the ALJ's decision and on April 22, 2010, the Appeals Council granted the request for review and remanded her case back to the ALJ. Tr. at 491, 497-502. The Appeals Council found that the ALJ did not give consideration to Plaintiff's ability to perform substantial gainful activity through the date of his decision as he limited the evaluation of her impairments to October 1, 2007 the date that her disability ceased, rather than considering the evidence through the date on which the appeal decision was made. *Id.* at 498-499.

The Appeals Council also noted that Plaintiff had filed another application for DIB on June 23, 2009 and it was determined that Plaintiff was entitled to disability benefits. Tr. at 499. The

-4-

Appeals Council noted that the evidence in support of this claim conflicted with evidence presented before the ALJ, particularly concerning Plaintiff's right-sided weakness.  *Id.*  The Appeals Council therefore reopened the June 23, 2009 disability determination as well and remanded both it and the prior decision to the ALJ and ordered him or her to obtain a neurological consultative examination and to obtain a medical expert in order to review all of the available evidence and to assist in clarifying the severity of Plaintiff's impairments.  *Id.* at 500.

On December 14, 2010, the same ALJ who decided Plaintiff's case initially held another hearing, with Plaintiff and her counsel present.  Tr. at 859.  The ALJ explained that he had decided the case according to Massachusetts caselaw because that is where he was during the videotaped hearing.  *Id.* at 860.  He noted that Sixth Circuit caselaw was different, as held by the Appeals Council, and he was required to hold another hearing and redetermine Plaintiff's case and the most recent application finding Plaintiff disabled.  *Id.*  However, the ALJ did not proceed with the hearing as jurisdictional issues were raised regarding combining the prior case with the new application for disability that was granted.  *Id.*

On November 29, 2011, another ALJ held a hearing, this time in Toledo, Ohio.  Tr. at 869.  The ALJ informed Plaintiff that as per the Appeals Council's remand order, she would be making a new decision as to both the cessation of Plaintiff's disability and the granting of her most recent disability application.  *Id.* at 871.  She also indicated that she spoke with Plaintiff's counsel before the hearing and he agreed to waive the right to have a ME even though the Appeals Council had ordered her to have a ME.  *Id.* at 872.  Plaintiff's counsel affirmed and indicated that he would file a written waiver after the hearing.  *Id.* at 872-873.  The ALJ also indicated that although the Appeals Council directed her to obtain a neurological consultative examination, Ohio law did not give her the ability to obtain such a specific examination, but she could obtain a regular consultative examination

for Plaintiff, which would not prove as useful in this case.  *Id*. at 873.  She reported that she had discussed this with Plaintiff's counsel prior to the hearing as well and he indicated that they would waive a regular consultative examination and he would put that in writing.  *Id.*

The ALJ then proceeded with the hearing, indicating that she was considering the entire time period since October 1, 2007.  Tr. at 873.  She took testimony from Plaintiff, with counsel present, Plaintiff's son, and the vocational expert ("VE").  *Id*. at 874-903.  Plaintiff's attorney also questioned Plaintiff, her son and the VE.  *Id*.

On January 10, 2012, the ALJ issued a decision finding that Plaintiff's disability ended as of October 1, 2007 and she had not been under a disability from that date through the date of the ALJ's decision.  Tr. at 15.  The ALJ found that through October 1, 2007, Plaintiff had the medically determinable impairments of:  degenerative joint disease ("DJD") at C5-C6; status/post remote renal transplant; hyperlipidemia; allergies; migraine headaches; bulge at L4-L5 and L5-S1; right carpal tunnel syndrome; hypertension; history of remote transient ischemic attack ("TIA")/cerebrovascular accident ("CVA"); and coronary artery disease ("CAD").  *Id*. at 17. The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairment in the Listings.  *Id*.  She further found that medical improvement had occurred as of October 1, 2007 and the medical improvement was related to the ability to work because as of that date, the impairment in the comparison point decision under which Plaintiff was originally granted disability benefits because her impairments  no longer met or medically equaled the Listings that were met at that time.  *Id*. at 18.

The ALJ further found that as of October 1, 2007 through the date of her decision, Plaintiff continued to have a severe impairment or combination of severe impairments of DJD at C5-C6 and

status post renal transplant. Compare Tr. at 17 with Tr. at 24. Nevertheless, the ALJ considered all of Plaintiff's severe and non-severe impairments in finding that Plaintiff was able to perform light work with the following limitations: working in a seated or standing position in jobs with a Specific Vocational Preparation rating of 1 to 2; a pace of production not dictated by an outside source over which the claimant has no control; occasionally climbing stairs, kneeling and crouching; never climbing ladders or balancing on one leg at a time; never working around environmental hazards; rare (less than occasionally but not completely precluded) exposure to temperature extremes; occasional exposure to humidity and respiratory irritants; and rare exposure to physical contact with the general public and occasional exposure to physical contact with coworkers due to side effects of Plaintiff's immunosuppressive drug therapy. *Id*. at 25.  Based upon this RFC and the VE's testimony, the ALJ found that Plaintiff was able to perform her past relevant work as a wiring harness assembler and could perform a significant number of jobs existing in the national economy.  *Id*. at 32-33.

Plaintiff requested that the Appeals Council review the ALJ's decision and the Appeals Council reviewed the request and denied it.  Tr. at 6-10.  Plaintiff filed an appeal to this Court and Defendant answered.  ECF Dkt. #s 1, 9.  Both parties have filed briefs addressing the merits of the case and Plaintiff has filed a reply brief.  ECF Dkt. #s 15-17.  At issue is the ALJ's January 10, 2012 decision, which stands as the final decision.  Tr. at 14-35.

## II.   SUMMARY OF MEDICAL EVIDENCE

October 1997 emergency room notes indicate that Plaintiff had a history of chronic renal failure and hypertension secondary to the chronic renal failure.  Tr. at 91.  She presented on October 9, 1997 for vomiting and weakness and was not on dialysis at the time, despite renal failure.  *Id*.  Her medical history indicated that she developed a glomerulonephritis subsequent to streptococcal

infection from strep throat in 1995. *Id.* at 92. It was also noted that she suffered a CVA in 1995 due to hypertension and she had right-sided weakness that had mostly resolved. *Id.* at 93. Plaintiff was admitted from October 21, 1997 through October 24, 1997 with the principal diagnosis of acute renal insufficiency superimposed upon chronic renal insufficiency and other diagnoses of IgA nephropathy with nephrotic syndrome, mild hypertension, hyperlipidemia, past history of post streptococcal glomerulonephritis superimposed on IgA nephropathy, neurological disorder suggestive of TIAs or CVAs, not fully characterized, and questionable past history of interstitial cystitis. *Id.* at 107.

In December of 1997, Dr. Singh, a nephrologist, indicated that Plaintiff presented to a kidney transplant team and was going to be placed on the kidney transplant list. Tr. at 218.

On December 18, 1997, Dr. Mareska, Plaintiff's treating neurologist, completed an agency form stating that he first examined her on March 1, 1995 and last examined her on November 19, 1997 and diagnosed her with a stroke that had resolved. Tr. at 122-123. He noted that she had normal functioning, no fatigue, and received no therapy for the stroke. *Id.* at 121-122. He concluded that Plaintiff had no limits on her physical or mental work-related activities. *Id.* at 123. His office notes document that Plaintiff complained of daily headaches, although she usually took Tylenol as opposed to the Doxepin and Darvocet that she was prescribed to resolve them. *Id.* at 124-126.

On April 28, 1998, Plaintiff was admitted to the hospital after a kidney became available for transplant. Tr. at 295. The hospital records indicate that Plaintiff had been on dialysis since December of 1997 and she tolerated the transplant well. *Id.* She was discharged on May 3, 1998 with diagnoses of end-stage renal disease, hypertension, history of CVA, migraine headaches, immunoglobulin A nephropathy, and cadaveric renal transplantation. *Id.*

On June 21, 1998, Plaintiff was admitted to the hospital after presenting to the emergency

-8-

room because of a twenty-four hour fever, myalgias, weakness and fatigue.  Tr. at 291.  She was diagnosed with a urinary tract infection, rule out viral syndrome, status post cadaveric renal transplantation, hypertension, history of CVA, and migraine headaches.  *Id.*  The attending doctor found no edema or calf tenderness, but Plaintiff's urinalysis revealed white blood cells and moderate bacteria, as well as a few red blood cells.  *Id*. She was  discharged on June 24, 1998.  *Id.*

On February 17, 2004, Plaintiff presented to the emergency room for right-sided weakness the past few days.  Tr. at 329.  She stated that she suffered a stroke before and was concerned about having another.  *Id*.  A head CT scan showed normal results.  *Id*. at 328.  Plaintiff was diagnosed with right-sided weakness and told to take one baby aspirin a day and follow up with her nephrologist.  *Id*.

On November 16, 2004, Plaintiff underwent an osteoporosis screening which showed spine bone density normal for Plaintiff's age and hip bone density that was lower than expected, although it was still within normal limits.  Tr. at 265.

On September 12, 2005, Plaintiff was admitted to the hospital because of a urinary tract infection and congestion, fever and chest heaviness after contact with her son who had pneumonia two weeks prior.  Tr. at 212.  Plaintiff's white blood cell count showed a left shift. *Id*. Her history of transplant, renal disease, hypertension, hyperlipidemia and immunosuppressive state was noted, as well as a history of possible right sided hemiparesis in the past because of severe migraine headaches. *Id*.  Plaintiff was given an IV antibiotic.  *Id*. at 213.

On September 15, 2005, Plaintiff presented to the emergency room complaining of diffuse myalgia, fever, sinus congestion and a dry cough.  Tr. at 211.  Her final diagnoses were upper respiratory infection with fever, end stage renal disease and status post deceased donor transplant with stable renal function*. Id.*

Plaintiff apparently moved from Ohio to North Carolina and had an initial consultation with Dr. Chaudhary of Central Carolina Nephrology on December 15, 2005.  Tr. at 134, 141.  He noted Plaintiff's history and indicated that Plaintiff had undergone a renal transplant in late 1998 and was taking low-dose Prednisone, Neoral, and CellCept with excellent renal function.  *Id*.  Plaintiff reported that her only problems were  occasional episodes of pyelonephritis, occasional sinus congestion, and bronchitis episodes.  *Id*.  There were no problems with kidney rejection.  *Id.*  Plaintiff reported that her doctor was trying to wean her off of Prednisone but she developed arthritic aches and pains so she was placed back on the medication.  *Id*.  Dr. Chaudhary also noted that Plaintiff had significant side effects from Prednisone with osteoporosis.  *Id.* at 134.  He continued her current medications and was considering some type of therapy for her osteoporosis.  *Id*. at 135.

Dr. Chaudray's March 7, 2006 notes indicate that Plaintiff had no complaints except for some tiredness and fatigue.  Tr. at 146.  No edema in the extremities was noted but Plaintiff was having some trouble with her cyclosporin level adjustment.  *Id.*  August 22, 2006 notes from Dr. Chaudray indicate that Plaintiff was doing very well and had stable renal function over the years.  *Id*. at 145.

Dr. Chaudray's March 14, 2007 notes indicated that Plaintiff continued to do reasonably well and Plaintiff's myalgias and occasional arthritis were no longer an issue after Lipitor was discontinued and she was placed on Zocor therapy.  Tr. at 141.  No focal neurologic deficits were noted and Dr. Chaudray found that almost ten years after her transplant, Plaintiff had stable renal function and had no active complaints.  *Id.*

Plaintiff began treating with Dr. Mattox as her primary care physician from 2004 through at least 2011 for her DDD, hypertension, hyperlipidemia, sinusitis, diarrhea, vomiting, status post kidney transplant, numbness, and cervical neurological stenosis.  Tr. at 329-354, 551-818.

-10-

On September 12, 2007, Dr. Brar, Plaintiff's transplant nephrologist, wrote a letter to Dr. Mattox after examining and evaluating Plaintiff at his request.  Tr. at 207-208.  Dr. Brar noted that he had first examined Plaintiff in October of 2005 after she suffered facial injuries from a fall that he believed may have been related to orthstatic hypotension from steroid withdrawal.  *Id*. at 207.  He indicated that she was thereafter restarted on Prednisone every other day and then moved to North Carolina where she was followed by a nephrologist in that area.  *Id*. He explained that Plaintiff then moved back to Toledo and wanted to resume medical care with him.  *Id*.

Dr. Brar identified Plaintiff's list of problems as including end-stage renal disease secondary to IgA nephropathy, cadaveric renal transplant in 1998 with stable renal function, chronic steroid use with no evidence of osteoporosis, hyperlipidemia, hypotension, recent episode of E. coli transplant pyelonephritis treated with antibiotics and recovered completely, and orthostatic hypotension with an episode of fall presumed to be related to steroid withdrawal.  Tr. at 207.  Upon examination, Dr. Brar noted that Plaintiff had no specific symptoms and denied nausea, vomiting, shortness of breath or chest pain. *Id*. at 207.  She also indicated that she had no urinary tract infections since she had gone to North Carolina.  *Id*.  Dr. Brar found no weakness in Plaintiff's arms or legs, and no balance problems.  *Id*. at 208.  He found her muscle power and tone to be normal and her extremities showed no edema.  *Id*.  He diagnosed Plaintiff with status-post deceased donor transplant with stable graft function, orthostatic hypotension secondary to steroid withdrawal but better with the reinstitution of steroids, recurrent urinary tract infections stable on prophyatic antibiotics, and high risk for osteoporosis.  *Id*. at 209.  He ordered a DEXA scan, continued her medications and scheduled her for a follow up examination.  *Id.*

On October 5, 2007, Plaintiff underwent a DEXA scan for osteoporosis which showed a

normal bone mineral density evaluation.  Tr. at 205.

On October 15, 2007, Plaintiff underwent a colonoscopy and anoscopy with hemorrhoid banding for rectal bleeding and neoplasm screening.  Tr. at 183.  Her postoperative diagnoses were mild diverticulosis and congested and prolapsing internal hemorrhoids.  *Id*.  She was advised to have a repeat colonoscopy in five years because of chronic immunosuppression from her medications and suboptimal bowel preparation.  *Id*. at 184.

On March 5, 2008, Dr. Brar examined Plaintiff, who reported that she had been doing well, although she had a macular lesion and some dizzy spells.  Tr. at 459.  He found no weakness in her arms or legs, no balance problems and she reported no falls.  *Id*. at 461.  She had no edema on her extremities, no focal deficits and no synovitis or deformities upon joint examination.  *Id*.  He referred her to a dermatologist for the eye lesion and changed some of her medications.  *Id*. at 462.

On June 4, 2008, Dr. Brar examined Plaintiff, who reported that she was doing well, and he found no weakness in Plaintiff's arms and legs, no balance problems, no focal deficits, no edema and no deformities.  Tr. at 456-457.  He diagnosed status post deceased donor transplant with stable graft function with current medications and steroids tapered down to the bare minimum, hyperlipidemia with elevated LDL cholesterol and hypopigmented macule for dermatology follow-up.  *Id*.  He increased her cholesterol medication and encouraged Plaintiff to keep her doctor's appointment concerning her eyelid lesion.  *Id*. at 458.

On October 1, 2008, Plaintiff followed up with Dr. Brar and she reported that she was doing well, but had sinus congestion, blocked ears and a respiratory tract infection, as well as pain in her right foot and leg.  Tr. at 453.  Upon physical examination, Dr. Brar found no focal deficits, no edema of the extremities and no deformities in the joints.  *Id*.  He diagnosed upper respiratory infection likely

-12-

from chronic sinusitis, lower extremity pain likely from DJD, peripheral neuropathy from immunosuppressive medications, status post decreased donor transplant with stable graft function, hyperlipidemia with elevated LDL cholesterol and hyperpigmented macule on supraorbital region that turned out to be benign.  *Id*. at 454-455.  Dr. Brar prescribed Flonase nasal spray for Plaintiff's sinus congestion.  *Id*. at 455.

On January 20, 2009, Plaintiff presented to Dr. Mattox complaining of right arm cramping, numbness and weakness.  Tr. at 332.  He diagnosed right arm radiculopathy, hypertension under good control, left eyebrow lesion, and status post kidney transplant.  *Id*.  He scheduled a MRI of the cervical spine, prescribed medication, and referred her to a dermatologist for the eyebrow lesion.  *Id*. The MRI showed:  no significant spinal canal stenosis at C2-C3 or at C7-T1; no significant spinal canal or neural foraminal stenosis at C3-C4;  "very minimal disc bulge with minimal spinal canal stenosis" at C4-C5 with no significant neuroforaminal stenosis; "minimal disc bulge results in very minimal spinal canal stenosis" at C6-C7 with no significant neuroforminal stenosis; and at C5-C6, a posterior disc osteophyte complex resulting in "mild to moderate spinal canal stenosis," with "some slight flattening of the anterior margin of the spinal cord without definite abnormal cord signal" and moderate right neuroforaminal stenosis secondary to uncovertebral hypertrophy and disc osteophyte complex.  *Id*. at 410-411.  A biopsy of the eyebrow lesion revealed hypertrophic actinic keratosis. *Id.* at 533, 544.

On January 21, 2009, Plaintiff presented to Dr. Brar for follow up of her conditions.  Tr. at 449-451.  He noted that she was doing well, but she reported problems with right upper and lower extremity weakness and paresthesis which had been going on for awhile.  *Id*. at 449.  She denied shortness of breath and current urinary tract infections, and upon physical examination, Dr. Brar found no focal deficits, but trace edema of the extremities.  *Id*. at 450.  Dr. Brar diagnosed status-post decreased donor transplant with stable graft function, right upper and lower extremity weakness likely

radiculopathy versus cord compression, precancerous left eye skin lesion, hyperlipidemia, recurrent urinary tract infections, and osteopenia based on a previous bone density scan. *Id*. at 451. Dr. Brar ordered a DEXA scan, requested the MRI report concerning Plaintiff's right upper and lower extremities, changed a cholesterol medication, and requested that Plaintiff forward him the report from Dr. Anders concerning evidence of possible carcinoma of her left supraorbital region. *Id*.

On February 20, 2009, Plaintiff presented to Dr. Mattox for follow up and he informed her that the MRI showed that she had a cervical neuroforaminal stenosis. Tr. at 331. Her other diagnoses included hypertension which was stable on medication and status post kidney transplant which was also stable. *Id*. Dr. Mattox referred Plaintiff to a neurosurgeon. *Id*.

On March 24, 2009, Dr. Dirrenberger, a neurosurgeon, evaluated Plaintiff at Dr. Mattox's request. Tr. at 463. He noted that Plaintiff reported that she had been experiencing numbness all over her body, greater on the right side and including her face, since her renal transplant. *Id*. Plaintiff stated that the numbness had progressed over the years and she noticed a loss of dexterity and clumsiness in her right hand. *Id*. She indicated that she could walk, but if she walked for longer periods, she felt like she was dragging her right side. *Id*. She reported that over the last two to three years, she developed the same symptoms on her left side as well, although not as severe as the right side. *Id*. She also indicated that she experienced more severe headaches on occasion, but had no decline in vision, or  difficulty speaking or swallowing. *Id*. Plaintiff reported excessive fatigue, sleeping problems, elevated cholesterol, hypertension, heartburn, nausea, vomiting, hemorrhoids, and past rectal bleeding. *Id*.

Upon examination, Dr. Dirrenberger noted that Plaintiff had swollen joints, leg pain with walking and at rest, normal cervical spine range of motion, negative foraminal compression test, normal bilateral arm and leg strength and tone, no atrophy, and loss of pinprick and touch sensation in the right side of her body, including the face, arm, trunk and leg, and a mildly unsteady gait. Tr.

at 465-466.  He noted the January 2009 MRI scan which showed mild degenerative spondylosis at C5-C6 with no critical neural element compression, no significant cord compression, and no signal changes within the cord.  *Id*. at 466.  He ordered a head MRI and EMG/nerve conduction studies for Plaintiff's arms and legs.  *Id*.  He noted that the etiology of Plaintiff's symptoms was not clear because Plaintiff lacked any abnormality in her cervical spine that would explain her symptoms.  *Id*.

Dr. Dirrenberger noted that the EMG of the right upper extremity showed no abnormalities and the brain MRI showed only minor nasal sinus mucosal thickening but no brain abnormalities that would explain her numbness.  Tr. at 578, 604-606, 639.  He referred her back to Dr. Mattox.  *Id*.

On April 10, 2009, Dr. Anders, the dermatologist, noted that the results of a biopsy of Plaintiff's left suprabrow lesion showed hypertrophic actinic keratosis.  Tr. at 532-533.  He treated her for the condition and indicated that she had a good response.  *Id*. at 534-549.

On May 18, 2009, Dr. Dirrenberger examined Plaintiff and found that her bilateral arm and leg strength were normal, with no atrophy, she had normal sensation in both legs, but loss of pinprick and touch sensation in the right side of her body, including her face, arm, trunk and leg.  Tr. at 577-578.  He noted that a prior EMG of the right upper extremity showed no abnormalities, a prior cervical MRI showed no evidence of cord compression, a MRI of the brain showed minor nasal sinus mucosal thickening, but no brain abnormalities, and a MRA showed no significant pathological lesions.  *Id*. at 578, 604-606, 639.  Dr. Dirrenberger found no structural lesion to explain Plaintiff's numbness and he returned her care to Dr. Mattox.  *Id*.

On July 21, 2009, Plaintiff presented to the emergency room complaining of left arm pain since the night prior which had worsened and which started at her shoulder and traveled down to her hand.  Tr. at 585.  She stated that her left upper extremity was weak and she had decreased muscle strength in that arm.  *Id*.  She also complained of facial numbness on the left side.  *Id*.  She reported her prior stroke, hypertension, high cholesterol and kidney transplant.  *Id*.  Edema was noted in

Plaintiff's bilateral lower extremities.  *Id.* at 586.  Plaintiff was diagnosed with a possible TIA and was admitted to the hospital.  *Id.*  She was kept overnight for testing and a chest x-ray and head CT scan showed normal results.  *Id.* at 587-590.  An echocardiogram showed mild asymmetric septal hypertrophy, normal LV cavity size and RV size, but some density attached to the atrial surface of the anterior mitral leaflet raising concerns for a vegetation.  *Id.* at 587-588.  She was discharged with instructions to take one baby aspirin per day and to follow up with a neurologist.  *Id*. at 596.

On August 25, 2009, Dr. Zangara of Toledo Neurological Associates, Inc. performed a neurologic evaluation of Plaintiff at the request of Dr. Mattox.  Tr. at 661.  He noted that Plaintiff complained of shortness of breath, sinus congestion, abnormal bleeding or bruising, arthralgias, back pain, myalgias, neck pain and restless leg symptoms, as well as numbness, weakness, headache, spasms, and depression.  *Id.*  He noted her reports of a progressive numb and weak feeling on the right side from head to toe that had intensified over the years, as well as occasional lightheadedness and rare shortness of breath.  *Id.* at 663.  On examination, Dr. Zangara found Plaintiff to be very fit, with no cognitive, speech or language difficulties, intact pulses, and a diminution in pin and light touch over the right face compared to the left although the corneal responses were symmetrical.  *Id.*  He further found that a vibratory stimulus over the forehead was different on the left than the right with a diminution on the right.  *Id.*  Sensory testing also demonstrated an alteration of pin, vibration and light touch over the right limbs and digits.  *Id.* at 663-664.  His impression was "CVA/Stroke/Multi Infarct State."  *Id.* at 663.  He indicated that he found no brain injury or explanation for Plaintiff's complaints but he was concerned that her stroke risk workup had not been completed.  *Id.* at 664.  He recommended a transesophageal echocardigram ("TEE") and hypercoagulable tests, and noted that he had "NO neurologic diagnosis to provide aside from explaining the symptoms as an anxiety disorder."  *Id.*  He stated that Plaintiff "AMPLIFIES the neurologic issues with sensory complaints that appear to have no neurologic basis and the same with motor findings."  *Id.*  He concluded that

"there is no evidence by routine laboratories to suggest serious central nervous system disease, ischemic cerebrovascular problems, demyelination, or even traumatic illness.  Likewise, there is no basis for an infectious explanation or other more esoteric basis for her complaints."  *Id.*

On September 9, 2009, Dr. Mattox referred Plaintiff to Dr. Lal, a cardiologist, for her echocardiogram results and her complaints of fatigue and right arm pain and weakness.  Tr. at 648. Dr. Lal noted her conditions and found no abnormalities upon physical examination.  *Id*. at 648-650. He referred her for a stress test.  *Id*. at 650.  Plaintiff underwent a stress test which revealed no evidence of inducible ischemia or infarct and normal results.  *Id*. at 653.

On September 16, 2009, Dr. Brar evaluated Plaintiff at the request of Dr. Mattox.  Tr. at 678. He identified Plaintiff's diagnoses, which included her recent evaluation by Dr. Zangara for upper extremity weakness with decreased grip strength and paresthesis on the right side of her face.  *Id*.  He indicated that Plaintiff's upper extremity weakness and loss of grip strength were persisting.  *Id*. at 679.  Dr. Brar diagnosed recurrent TIAs on both the symptoms of extremity weakness and sensory symptoms of paresthesis without any overt MRI or MRA findings.  *Id*. at 680.  He also diagnosed loss of grip strength in both hands, status post deceased donor transplant with stable graft function, and density of the anterior surface of the mitral valve of unclear etiology.  *Id.*  He ordered further testing, including repeating a carotid Doppler and blood tests.  *Id.*

On September 22, 2009, Plaintiff underwent a bilateral carotid Doppler ultrasound which revealed minimal atherosclerotic plaque in the right and left carotid bifurcations.  Tr. at 602.  An echocardiogram on the same day showed a trivial aortic insufficiency, mild tricuspid regurgitation, and no obvious cardiac masses.  *Id*. at 654.  Dr. Lal diagnosed abnormal EKG, mitral lesion, CAD, and status post renal transplant.  *Id*. at 647.

On October 5, 2009, a TEE for a suspicious mitral value mass from an echocardiogram showed normal results.  Tr. at 579.

On October 21, 2009, Plaintiff followed up with Dr. Lal, who noted tachycardia and diagnosed abnormal EKG/mitral lesion, CAD/fatigue, and status post renal transplant. Tr. at 645. He continued her medications and told her to follow up in six months. *Id*.

On February 3, 2010, Dr. Brar evaluated Plaintiff. Tr. at 673. He reviewed Plaintiff's diagnoses which included right sided weakness and pain, as well as dizziness and lightheadedness at times. *Id*. at 673-674. Dr. Brar noted that Plaintiff's hypercoaguable work-up was negative, as well as the prior echocariogram. *Id*. at 674. He indicated that he had tried steroid withdrawal in the past but Plaintiff did not tolerate that well. *Id*. Dr. Brar noted an unremarkable physical examination and diagnosed progressive weakness of the limb muscles, particularly involving the distal right side and the proximal leg muscles, with the possibility of steroid induced myopathy because Plaintiff was showing signs of wasting. *Id*. at 675. He also noted the possibilities of ongoing cerebral ischemia versus vasculitis but thought they were less likely because of normal MRI results. *Id*. He scheduled a cerebral angiogram and discontinued one of her medications. *Id*. at 676.

On February 17, 2010, Plaintiff underwent a cerebral angiogram for her complaints of right-sided weakness. Tr. at 598. The results were normal. *Id*. at 598-601.

Dr. Mattox treated Plaintiff for various conditions and complaints from 2004 through 2010, including her allergies, hypertension, her condition status post transplant, acute gastritis, and cervical disc disease. Tr. at 541-567. Such complaints included nausea, vomiting, and sinusitis in August of 2010, vertigo and muscle cramping in September of 2010. *Id*. at 551-554. He ordered an MRI in June of 2010 which showed minimal disc bulge at L4-L5 and L5-S1 without focal disc herniation or stenosis and he prescribed Mobic for Plaintiff's complaints of low back, hip locking and leg pain. *Id*. at 555-556, 570.

On March 31, 2010, Dr. Zangara performed a neurologic evaluation of Plaintiff at the request of Dr. Mattox. Tr. at 657. He noted that Plaintiff complained of shortness of breath, sinus congestion,

abnormal bleeding or bruising, arthralgias, back pain, myalgias, neck pain and restless leg symptoms, as well as numbness, weakness, headache, spasms, and depression.  *Id.*  Upon examination, Dr. Zangara found no neurologic injury.  *Id.* at 658-659.  His impression was "CVA/Stroke/Multi Infarct State." *Id.* at 659.  He noted that Plaintiff "returns unexpectedly" and was having the same issues as before, indicating that things have continued "and still involve mainly the right side producing numbness and weakness." *Id.*  He indicated that Plaintiff did not recall having the TEE and hypercoagulable tests that he had suggested a year ago.  *Id.*  He further noted that "[r]elevant is the fact that she continues to function on a daily basis with no sign of major disability." *Id.*  He also noted that no change in Plaintiff's medical, surgical or neurologic status had occurred and she was not on any other new medications or reporting any new problems.  *Id.*

Dr. Zangara indicated that Plaintiff's examination was intact and he found that she was a "thin though fit woman with no posture and no deformity," although he noted that she had a diminution of pin and cool temperature over the right side of her face with reduced vibration over the right side of her forehead.  Tr. at 658-659.  He found no visual field impairment, no face, tongue or shoulder weakness, but a subtle tremor of the right hand and some slowness in movement from time to time and a reduction of pin and vibration over the right limbs, much like the face. *Id.* at 659.

In summary, Dr. Zangara found no neurologic injury and the same results that he found a year ago with Plaintiff.  Tr. at 659.  He suggested that her features were induced by anxiety and he recommended a psychiatric consultation. *Id.*  He indicated that he gave her the benefit of the doubt and again suggested a TEE and hypercoagulable study. *Id.*  He saw no reason for further neurologic testing or reevaluation. *Id.*

On April 21, 2010, Plaintiff followed up with Dr. Lal and she reported that she was doing well. Tr. at 642.  He diagnosed abnormal EKG, mitral lesion, CAD, and status post renal transplant. *Id.* at 643.  He continued her medications and told her to follow up in six months. *Id.*

On May 12, 2010, Dr. Brar evaluated Plaintiff.  Tr. at 669.  He reviewed Plaintiff's diagnoses and noted that since she last saw him in February, she continued to complain of right upper and lower extremity weakness which had progressively worsened.  *Id*. at 670.  Dr. Brar wondered about steroid myopathy but noted that the process was more diffused and unilateral on the right side, which made him wonder more about a possible ischemic process versus a degenerative process even though she had negative imaging studies.  *Id.*  Plaintiff had no other complaints and indicated that she felt well, with a good appetite, no nausea or vomiting.  *Id.*  Dr. Brar diagnosed right upper and lower extremity weakness of unknown etiology although he noted that it could be an ischemic, degenerative or infective central process, or it may also be psychosomatic.  *Id*. at 671.

A MRI of the lumbar spine on June 22, 2010 for Plaintiff's right sided weakness, bilateral leg radiculopathy with swelling showed minimal disc bulges at L4-L5 and L5-S1 with no significant central canal or neuroforaminal stenosis.  Tr. at 570.

On August 23, 2010, Dr. Mattox examined Plaintiff for her complaints of vomiting, diarrhea, chills and headaches.  Tr. at 554.  He diagnosed acute gastritis, nausea, vomting, diarrhea and sinusitis and prescribed medications.  *Id*.

On August 31, 2010, Plaintiff followed up with Dr. Mattox for acute gastritis, diarrhea, sinusitis, fatigue, DDD, hypertension and post status kidney transplant and hyperlipidemia.  Tr. at 553.  She stated that she was doing a "little better," as she was not vomiting or experiencing diarrhea, but her balance had been off for the last month, she had body aches and muscle cramps, and her hands had been shaking.  *Id*.  He diagnosed vertigo and muscle cramps and ordered blood tests.  *Id*.

On September 8, 2010, Dr. Brar followed up with Plaintiff.  Tr. at 665.  He reviewed Plaintiff's diagnoses and noted that since she last saw him in May, she reported diarrhea ongoing for a month, abdominal cramping, occasional headaches, vertigo upon walking, and problems with her balance.  *Id.* at 666.  Dr. Brar noted that Dr. Mattox had diagnosed her with sinusitis and enterocolitis

and prescribed Mobic for developing DJD for Plaintiff's symptoms of pain, numbness and paresthesis in her hands.  *Id*.  Upon examination, Dr. Brar found no shortness of breath, normal bowel sounds, normal power and muscle tone, with a resting tremor in the right hand.  *Id*. at 667.  Joint examination was unremarkable.  *Id*.  Dr. Brar diagnosed acute diarrheal disease with suspicion of an infectious nature because of her immunosuppression, peripheral neuropathy from DJD or proximal myopathy from steroid use, vertigo of an unclear etiology, and status post transplant with good graft function. *Id.*  He discontinued the Mobic, prescribed Darvocet for joint pain, ordered labs, and indicated that he would check stool studies to rule out infectious process.  *Id.*

On September 9, 2010, Plaintiff followed up with Dr. Mattox for her vertigo and muscle cramping.  Tr. at 552.  He indicated that these conditions were improving and Plaintiff reported that she experienced the "normal pain" in her right side and joints.  *Id*.

On October 12, 2010, Plaintiff presented to Dr. Mattox for follow up and he noted that Plaintiff's hypertension, allergies, fatigue, degenerative disc disease ("DDD"), hyperlipidemia and status post kidney transplant were all stable on medications.  *Id*. at 551.

On October 20, 2010, Plaintiff followed up with Dr. Lal, who diagnosed her with an abnormal EKG, mitral lesion, CAD, and fatigue and status post renal transplant.  Tr. at 641.  He continued her medications and told her to follow up with him in six months.  *Id*.

On December 1, 2010, Plaintiff followed up with Dr. Brar and reported exacerbation of her right upper and lower extremities weakness including markedly decreased grip strength and numbness.  Tr. at 749.  She also complained of a cough.  *Id*. at 750.  He diagnosed right upper and lower extremity weakness with paresthesias and numbness that was not substantiated by any imaging abnormalities. *Id.* at 751.  He decreased her steroid medication, even though she already had, as he thought maybe her symptoms resulted from steroid myopathy, although he doubted so because her symptoms were  lateralized to the right side.  *Id.* at 749, 751.

On December 13, 2010, Dr. Brar sent Plaintiff to Dr. Loomus for a second neurological opinion as to her right-sided weakness, pain, numbness and tingling.  Tr. at 735.  Dr. Loomus found a normal objective physical examination, with no objective signs of weakness, but nonphysiological splitting of vibratory sensation down her forehead and jaw, which he thought she was embellishing due to sleep deprivation.  *Id*.  He told Plaintiff and her mother that he believed that Plaintiff had normal strength and that she was consciously or subconsciously embellishing her symptoms based upon sleep deprivation, and Plaintiff's mother suggested it was due to anxiety because of a nasty divorce that Plaintiff had been through two years ago.  *Id*.  Dr. Loomus prescribed Trazadone and advised Dr. Brar that no workup was necessary.  *Id.*

On December 16, 2010, Plaintiff had a DEXA scan performed and results showed no change from the last DEXA scan, with mild decreased bone mineral density.  Tr. at 787.

In January and February of 2011, Plaintiff followed up with Dr. Mattox for her complaints of ear pain and sinus congestion.  Tr. at 723-724.  He referred her to Dr. Westfall who performed a myringotomy with tympanostomy tube insertion.  *Id*. at 707-724.

Plaintiff followed up with Dr. Loomus on January 13, 2011 for her complaints of weakness.  Tr. at 731.  He reviewed her medical history and noted that Plaintiff reported such weakness as beginning after her renal transplant and progressing over the years and even affecting her left side.  *Id*.  Dr. Loomus further noted that Plaintiff had a MRI and MRA of the brain and neck which were normal, and Dr. Zangara recommended a TEE and hypocoagulable workup which were also both normal.  *Id*.  Plaintiff reported that she could not hold a pencil very long because of hand cramps, she was unable to open a new gallon of milk, she could sit in one position for only 30 to 60 minutes before she would suffer severe pain down the right side of her body, and she could only stand, walk or lie down for fifteen minutes at a time before pain would start so she would have to change positions.  *Id.*  Plaintiff further reported that the Trazadone that Dr. Loomus had prescribed made her feel tired all

day so she stopped taking it, after which she suffered a two-day long migraine. *Id*. Dr. Loomus noted Plaintiff's report of daytime sleepiness, neck pain, back pain, myalgias, stiffness, numbness, tingling, burning sensation, difficulty walking, facial, arm and hand weakness, limping, leg weakness and headaches. *Id*. Upon physical examination, Dr. Loomus found that Plaintiff's gait was normal with no unsteadiness, she had normal motor strength in all muscle groups with no obvious weakness, and normal muscle tone, but some limited movement of the right shoulder, diminished pinprick sensation on the entire right side, and decreased temperature at both ankles and the toes of both feet. *Id*. at 732-733. He diagnosed Plaintiff with chronic pain syndrome, persistent insomnia, and headache, and he prescribed Temazepam at bedtime and ordered a cervical spine MRI. *Id*. at 733.

On January 22, 2011, Plaintiff had a cervical spine MRI which showed spondylosis and disc protrusions, greatest at the C5-C6 and C6-C7 levels. Tr. at 743-744. C4-C5 showed a mild generalized disc protrusion with no neural foraminal or canal stenosis, while C5-C6 showed spondylosis and moderate generalized disc protrusion into the neural foramen, with no central canal stenosis, mild foraminal narrowing and no significant facet arthropathy. *Id*. at 743. The MRI also showed spondylosis at C6-C7 with disc protrusion with a prominent central annular tear, no central stenosis and minimal recess stenosis bilaterally. *Id.*

On March 9, 2011, Dr. Brar followed up with Plaintiff and diagnosed status-post donor transplant with excellent graft function, right upper and lower extremity weakness of unclear etiology and recurrent migraines. Tr. at 748. Dr. Brar noted that Dr. Loomus had repeated the cervical MRI and he was awaiting Dr. Loomus' final evaluation. *Id.*

On March 24, 2011, Plaintiff presented to Dr. Loomus who reviewed her medical history and Plaintiff's complaints of weakness. Tr. at 727. He noted that she stated that she had moderately severe weakness as she was unable to open a new gallon of milk, could sit in one position for only 30 to 60 minutes before she would suffer severe pain down the right side of her body, and she could

only stand, walk or lie down for fifteen minutes before pain wakes her up so that she had to change positions.  *Id.*  Plaintiff further reported that the Tramadol that he had prescribed for her at 50 milligrams three times per day seemed to help as her strength and sleep were better and she felt better. *Id.*  Dr. Loomus noted Plaintiff's report of daytime sleepiness, neck pain, back pain, myalgias, stiffness, numbness, tingling, burning sensation, difficulty walking, facial, arm and hand weakness, limping, leg weakness and headaches.  *Id.*

Upon physical examination, Dr. Loomus found that Plaintiff's gait was normal with no unsteadiness, normal motor strength in all muscle groups with no obvious weakness, and normal muscle tone, but she had some limited movement of the right shoulder, diminished pinprick sensation on the entire right side, and decreased temperature at both ankles and the toes of both feet.  *Id.* at 728-729.  He diagnosed Plaintiff with chronic pain syndrome, persistent insomnia, cervical disc degeneration, cervical spine stenosis and cervical spondylosis.  *Id.*  He reviewed her prior cervical MRI and concluded that Plaintiff's C5-C6 bulging disc was probably compressing the nerve root and causing some of the pain going into her right shoulder and arm.  *Id.* at 730.  He also suggested that the central disc herniation shown on the MRI may be compressing her spinal cord upon traction of Plaintiff's neck.  *Id.*  He ordered an EMG of the right upper extremity to rule out a pinched nerve. *Id.*  On April 11, 2011, Plaintiff underwent an EMG and nerve conduction study of the right extremity which showed no evidence of right cervical radiculopathy.  Tr. at 725.  Based upon the results, Dr. Loomus commented that Plaintiff appeared to have a right shoulder problem, such as bursitis, with asymptomatic DDD in the neck.  *Id.*  He also noted that Plaintiff had left elbow epicondylitis and he recommended that she wear a right carpal tunnel splint at night and a brace around the muscles during the day.  *Id.*

On June 26, 2011, Plaintiff presented to Dr. Westfall for edema of the larynx and vocal cords, eustachian tube dysfunction, and chronic laryngitis.  Tr. at 709.  He indicated that she was hearing

better after tube placement the prior year. *Id*. at 709-720.

On July 12, 2011, Plaintiff underwent a brain MRI for her complaints of headaches and right-sided paresthesias "for 13 years." Tr. at 782. The results showed a focal T2 hyperintense signal in the posterior aspect of the right basal ganglia, with questionable minimal restricted diffusion, which may represent a small focal area of ischemia. *Id*. Results also showed foci of T2 hyperintense signal in the cerebral white matter bilaterally with no restricted diffusion to suggest ischemia. *Id*. Other etiologies besides ischemia were suggested such as demyelinating process or sequela of inflammatory or infectious process. *Id*. Further studies were recommended. *Id*. Mild mucosal thickening the maxillary sinuses was also found. *Id*.

On July 13, 2011, Plaintiff followed up with Dr. Ansevin for her complaints of numbness and tingling. Tr. at 792. She reported no palpitations, diarrhea, nausea, vomiting, chest pain, shortness of breath, and no headaches. *Id*. Upon examination, he noted no edema, normal motor power throughout her upper and lower extremities, and intact pain, temperature, light touch and vibratory senses in all extremities. *Id*. at 793. He observed her gait to be independent and stable with normal reflexes in her extremities and normal stride length, base and arm swing. *Id*. He reviewed her MRIs and found no lesion to explain her complaints. *Id*. at 794. He further found that her physical examination was unremarkable and he concluded that her symptoms were most likely secondary to anxiety. *Id*.

On July 18, 2011, Dr. Ansevin wrote a letter to Dr. Mattox informing him that he found evidence that Plaintiff had a borderline Vitamin B12 deficiency and he had told Plaintiff to take a B12 replacement. Tr. at 780. On August 1, 2011, Dr. Ansevin contacted Plaintiff by phone and she indicated that she was doing "ok" and had no new complaints. *Id*. at 791.

On August 11, 2011, Dr. Mattox saw Plaintiff for her conditions and found that her allergies, hyperlipidemia, hypertension and migraines were stable on medications. Tr. at 806. He noted her

complaints of right sided weakness and reviewed her medications.  *Id*.

On August 25, 2011, Dr. Ansevin reviewed Plaintiff's January 22 cervical MRI, her June 22 lumbar MRI and her July 11 brain MRI and concluded that the lesion found on the brain MRI most likely represented a remote microvascular infarct, but did not explain Plaintiff's diffuse symptoms. Tr. at 789.  He told her to follow up with her primary care physician.  *Id*.

On August 29, 2011, Plaintiff underwent a colonoscopy for rectal bleeding and her postoperative diagnosis was internal and external hemorrhoids.  Tr. at 784.

On September 12, 2011, Plaintiff followed up with Dr. Mattox.  Tr. at 805.  He found that her hyperlipidemia, hypertension, allergies and migraines were stable on medications.  *Id*.

### III.    SUMMARY OF TESTIMONIAL EVIDENCE

At the most recent hearing on November 29, 2011, the ALJ indicated that she would be considering both the termination of Plaintiff's disability benefits and her most recent application for benefits that was granted.  Tr. at 871.  The ALJ reported that she had spoken to counsel for Plaintiff before the hearing and informed him that "I indicated to you that the Appeals Council mandated that I have a medical expert and we have no medical expert.  And I asked you, I offered you the chance to postpone or go ahead and waive the medical expert and you indicated that you would be willing to waive that, is that correct?"  *Id*. at 872.  Plaintiff's counsel answered that he had agreed to waive the medical expert and he would submit the waiver in writing.  *Id*. at 873.  The ALJ also indicated that the Appeals Council had mandated that she obtain a neurological consultation for Plaintiff "which is impossible for us to do.  We don't have the ability to do that in the state of Ohio."  *Id*.  The ALJ indicated that she and Plaintiff's counsel discussed the fact that Plaintiff could be sent for a regular consultative examination, not by a neurologist, and they questioned the value of such a consultation as Plaintiff had since been treated by her neurologist on several occasions during the relevant time period anyway.  *Id*.  Plaintiff's counsel agreed to waive the consultative examination as well.  *Id*.

Plaintiff thereafter testified, as did her adult son and a VE. Tr. at 870. Plaintiff indicated that she was 47 years old and divorced, and both of her sons lived with her. *Id.* at 874. She stated that she had a driver's license but had difficulty driving because of problems with her back, legs and hips. *Id.* at 874-875. Plaintiff last worked about fifteen years ago. *Id*. at 875. She affirmed that she was originally awarded social security benefits because she had a kidney transplant and she then began having right sided weakness shortly thereafter. *Id*. at 876. She also reported problems with her hands, arms, legs and her lower back and hips. *Id.* at 877-878. Plaintiff also testified that she gets headaches everyday but gets migraines every other day. *Id*. at 879. She averaged about three to four hours of sleep during the night and napped during the day for an hour or two. *Id*. at 878.

Plaintiff indicated that her medications cause her nausea and sometimes vomiting for about an hour after she takes them. Tr. at 879, 887. She stated that nothing makes her pain and discomfort better, although she later indicated that taking Tramadol decreases her pain level from a 7 to a 4, but it makes her sleepy. *Id.* at 880, 889. On a typical day, Plaintiff reported that she does small loads of laundry, washes dishes in a dishwasher, cleans the house a little bit, cooks simple meals, and watches television. *Id*. She opined that she it would be very difficult for her to walk around the block, she could stand for about ten minutes at a time before her legs started to hurt, she could not sit for very long due to pain, she could not lift even a gallon of milk, she could button clothes with some difficulty, and she could hold onto a coffee cup very carefully. *Id.* at 881-882. She can read for about thirty minutes at a time before she has to rest. *Id*. at 884.

Plaintiff also informed the ALJ about her other ailments, including her hemorrhoids, the precancerous lesion on her nose, and the tubes in her ears. Tr. at 883-884. She explained that the hemorrhoids interfere with her ability to sit and she is prone to infections because of kidney transplant and medications. *Id*. at 885. She explained that she could not work eight hours a day, forty hours per week because of the pain in her back, legs and hips and she would have to have the ability to rest

every so often. *Id*. at 889. She related that if she goes to the store for even a half hour, she has to come home due to pure exhaustion. *Id.* at 893.

Plaintiff's oldest son testified. Tr. at 893. He stated that he was twenty-five years old and had been living with Plaintiff for the last four years. *Id*. at 893-894. He explained that he has to do a lot for his mother, like opening jars, picking up clothes baskets and carrying them to the laundry room, and carrying in groceries. *Id*. He reported that Plaintiff spent at least 15 of 30 days per month in bed or lying on the couch all day. *Id.* He indicated that Plaintiff usually does not eat on those days and when she does try to eat, she vomits. *Id.* at 895-896. Plaintiff's son stated that he works forty to sixty hours per week but he knew that his mother was in bed or on the couch because he checks on her before he left for the day and checks on her throughout the day by phone. *Id*. at 896-897.

Thereafter, the VE testified. Tr. at 898-906. She classified Plaintiff's past relevant work and testified that a significant number of jobs existed in the economy for the hypothetical individuals that the ALJ presented to him. Tr. at 897-906.

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the following required sequential steps for evaluating whether entitlement to DIB or SSI continues or should terminate:

(1) Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).

(2) If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this

section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).

(5) If we found at step (3) it is found that there has been no medical improvement or if it is found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

(6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

(7) If your impairment(s) is severe, the ALJ will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, the ALJ will assess your residual functional capacity based on all your current impairments and consider whether you can still do work your have done in the past. If you can do such work, disability will be found to have ended.

(8) If you are not able to do work that you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (f)(7) of this section and your age, education and past work experience (see paragraph (f)(9) of this section for an exception to this rule).  If you can, we will find that your disability has ended.  If you cannot, we will find that your disability continues.

(9) We may proceed to the final step, described in paragraph (f)(8) of this section, if the evidence in your file about your past relevant work is not sufficient for us to make a finding under paragraph (f)(7) of this section about whether you can perform your past relevant work.  If we find that you can adjust to other work based solely on your age, education, and residual functional capacity, we will find

that you are no longer disabled, and we will not make a finding about whether you can do your past relevant work under paragraph (f)(7) of this section.  If we find that you may be unable to adjust to other work or if § 404.1562 may apply, we will assess your claim under paragraph (f)(7) of this section and make a finding about whether you can perform your past relevant work.

20 C.F.R. §§ 404.1594(f)(1-9); 416.994(b)(5)(i-vii).

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

    1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§ 20 C.F.R. 404.1520(b) and 416.920(b) (1992));

    2. An individual who does not have a "severe impairment" will not be found to be "disabled" (§§ 20 C.F.R. 404.1520(c) and 416.920(c) (1992));

    3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§ 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§ 20 C.F.R. 404.1520(d) and 416.920(d) (1992));

    4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§ 20 C.F.R. 404.1520(e) and 416.920(e) (1992));

    5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§ 20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir.1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and RFC. *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir.1990).

### V.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Id.; Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 532 (6th Cir. 1997).  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

The Sixth Circuit has held that "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion...This is because there is a 'zone of choice' within which the Commissioner can act without fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Therefore, the ALJ's decision  "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Moreover, this Court can remand a case to the Commissioner under sentence four of 42 U.S.C. § 405(g),  sentence six of 42 U.S.C. § 405(g), or under both of these sections.  Sentence four provides that a district court has the power "to enter, upon the pleadings and transcript of the

record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A sentence-four remand provides the required relief in cases where  there is insufficient evidence on the record to support the Commissioner's conclusions and further factfinding is necessary.  *See Faucher v. Secretary of Health and Human Servs*.,  17 F.3d 171, 174 (6th Cir. 1994), citing *Sullivan v. Finkelstein*, 496 U.S. 617, 625-26 (1990).  "It is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Oliver v. Secretary of Health & Human Serv*s., 804 F.2d 964, 966 (6th Cir.1986), citing *Willis v. Secretary of Health and Human Servs.*, 727 F.2d 551 (6th  Cir. 1984).

An ALJ's decision may be reversed and benefits immediately awarded only if the record adequately establishes a plaintiff's entitlement to benefits.  *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).  The decision to deny benefits can be reversed and benefits immediately awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking.  *See Faucher*, 17 F.3rd 171, 176 (6th Cir. 1994).  Where further factual issues remain, the case should be remanded for further factfinding.  *See id.*

## VI.    ANALYSIS

### A.       TREATING PHYSICIAN RULE

Plaintiff first asserts that the ALJ erred by failing to give the February 26, 2009 opinion of her treating nephrologist, Dr. Brar, controlling weight.  ECF Dkt. #15 at 17-20.   Dr. Brar indicated in that opinion that Plaintiff's immunosuppressive medications and end stage renal disease have caused "disabling musculoskeletal symptoms" involving Plaintiff's upper and lower extremities, which have incapacitated her and affected her activities of daily living.  Tr. at 496. He concluded that due to the symptoms of weakness and paresthesias, "she is unable to hold onto

any vocation and is relying on social security for benefits to cover the cost of post transplant nephrology care" and to cover the cost of her immunosuppressive medications. *Id.*

The ALJ addressed this opinion. Tr. at 31-32. She first noted that medical opinions that a claimant is disabled or is unable to work are not entitled to controlling weight because such decisions are reserved for the Commissioner. *Id.* at 31. She thereafter attributed little weight to Dr. Brar's opinion, finding that "he opines well beyond the area of his own specialty" and concluding that Dr. Brar's own findings and the objective medical evidence failed to support his opinion. *Id.* She also noted that Dr. Brar appeared sympathetic to Plaintiff as he indicated in the opinion that Plaintiff was relying upon social security benefits to cover the cost of her medical care and medications. *Id.* at 32.

The ALJ correctly noted that the ultimate determination of disability or a claimant's ability to work is that of the ALJ and not a medical source. 20 C.F.R. § 404.1527(d). Further, while sympathy of a doctor could play a role in a treating physician's opinion, the undersigned does not find that Dr. Brar's opinion showed that he was "highly sympathetic" to Plaintiff as found by the ALJ. Tr. at 32.

Nevertheless, the ALJ offered two other reasons for attributing less than controlling weight to Dr. Brar's opinion. The ALJ concluded that Dr. Brar's opinion was not supported by the record or by his own treatment notes and clinical findings. Tr. at 31-32. The undersigned recommends that the Court find that this conclusion is too generic to constitute good reason for the weight that the ALJ attributed to Dr. Brar's opinion. Further, contrary to the ALJ's finding, Dr. Brar's treatment notes consistently document Plaintiff's extremity weaknesses and complaints and his findings and diagnoses concerning those symptoms. The ALJ did not address these findings. For instance, on September 16, 2009, Dr. Brar examined Plaintiff and diagnosed recurrent TIAs as to Plaintiff's symptoms of extremity weakness and sensory symptoms without any overt MRI or

MRA findings.   Tr. at 678-679.  On February 3, 2010, Dr. Brar noted an unremarkable physical examination of Plaintiff, but diagnosed progressive weakness of the limb muscles with the possibility of steroid induced myopathy because Plaintiff was showing signs of wasting.  *Id.* at 675.  On May 12, 2010, Dr. Brar examined Plaintiff and again wondered about steroid myopathy but noted that the process was more diffused and unilateral on the right side, which made him wonder about a possible ischemic process versus a degenerative process even though Plaintiff had negative imaging studies.  *Id.* at 669-670.  He diagnosed right upper and lower extremity weakness of unknown etiology but noted that it could be an ischemic, degenerative or infective central process or it may be psychosomatic.  *Id.* at 671.   Dr. Brar again evaluated Plaintiff on September 8, 2010 and diagnosed peripheral neuropathy from DJD or proximal myopathy from steroid use.  *Id.* at 667.  On December 1, 2010, Dr. Brar diagnosed right upper and lower extremity weakness with paresthesias and numbness that was not substantiated by any imaging abnormalities. *Id.* at 750.  He nevertheless took action and decreased her steroid medication as he thought perhaps her problems were related to steroid myopathy, although he expressed doubt because of the lateralization of the symptoms to the right side.  *Id.* at 749, 751.

Further, the ALJ did not address other objective findings documenting Plaintiff's symptoms, including the July 21, 2009 emergency room records showing a possible TIA when Plaintiff presented there for numbness and left arm pain and had clinical findings of edema in the lower extremities.  *Id.* at 585.  On July 12, 2011, Plaintiff underwent a brain MRI for her complaints of headaches and right-sided paresthesias "for 13 years."  Tr. at 782.  The results showed a focal T2 hyperintense signal in the posterior aspect of the right basal ganglia, with questionable minimal restricted diffusion, which may represent a small focal area of ischemia.  *Id.* Results also showed foci of T2 hyperintense signal in the cerebral white matter bilaterally with no restricted diffusion to suggest ischemia.  *Id.*  Other etiologies besides ischemia were suggested

such as demyelinating process or sequela of inflammatory or infectious process.  *Id.*  Further studies were recommended.  *Id.*  On August 25, 2011, Dr. Ansevin reviewed Plaintiff's July 11 brain MRI and concluded that the lesion found on the brain MRI most likely represented a remote microvascular infarct.  *Id*. at 789.

The ALJ did review the findings and examinations of the neurologists that examined Plaintiff, including Drs. Dirrenberger, Zangara, Loomus and Ansevin.  Tr. at 31.  The ALJ correctly noted that none of these neurologists provided any functional limitations for Plaintiff and in fact, Drs. Zangara, Loomus and Ansevin opined that Plaintiff's symptoms were psychologically based.  *Id*. at 29.  Yet Dr. Zangara diagnosed Plaintiff with CVA/Stroke/Multi Infarct State on both occasions in which he examined her and he cliniially found diminution in pin, light touch and temperature on the right side of the body.  Dr. Ansevin also diagnosed Plaintiff with remote microvascular infarct.  *Id*.  And Dr. Loomus diagnosed Plaintiff with chronic pain syndrome, cervical disc degeneration, cervical spine stenosis and cervical spondylosis.  *Id*. at 725, 728-730.  None of the neurologists found a neurological basis for Plaintiff's pain and weakness.

However, Dr. Brar, Plaintiff's treating transplant nephrologist, opined that the basis of Plaintiff's symptoms were from the immunosuppressive medications given to her for her kidney transplant and her end-stage renal disease.  *Id*. at 496.  Both of these bases are conditions related to Dr. Brar's specialty.  Yet the ALJ found that Dr. Brar was opining "beyond the area of his own specialty."  *Id*. at 31.  Defendant asserts that this statement concerned Dr. Brar's comment that Plaintiff was unable to work at any vocation, which is a determination to be made by the ALJ and not a medical source.  ECF Dkt. #16 at 10.  However, with reliance by the ALJ upon the findings of the neurologists and without further explanation by the ALJ herself, the undersigned is unable to render such a determination.

Accordingly, the undersigned recommends that the Court find that the ALJ's reasons for

affording less than controlling weight to the opinion of Dr. Brar are insufficient to permit the Court to meaningfully review whether she properly applied the treating physician rule. The ALJ failed to adequately explain why or how Dr. Brar's opinion as to the basis of Plaintiff's symptoms was not supported by his own findings.  While the neurologists for the most part ruled out a neurologic basis for Plaintiff's complaints, although Plaintiff suffered from TIAs and Dr. Loomus diagnosed a chronic pain syndrome, this does not adequately explain why Dr. Brar's opinion as a treating nephrologist was not entitled to controlling weight.

Moreover, even if the ALJ correctly attributed less than controlling weight to the opinion of Dr. Brar, the undersigned recommends that the Court find that she failed to adequately analyze the factors in 20 C.F.R. § 404.1527(c)(2) through (c)(6) that must be considered in determining the weight to afford his opinion. The ALJ did not discuss the length and nature of the treating relationship that Dr. Brar had with Plaintiff or how Dr. Brar's specialty impacted her weight determination, besides the fact that he was opining "beyond the area of his specialty."  Further, while the ALJ reviewed the neurologists' findings that a neurological basis did not exist for Plaintiff's symptoms, she failed to explain how or why Dr. Brar's nephrologic opinion was not supported by his own objective and clinical findings as a nephrologist.  Nor did she indicate the evidence that she found to be inconsistent with Dr. Brar's opinion that rendered it entitled to little weight rather than great deference.

The undersigned recognizes an overlap between the neurologic and nephrologic opinions in this case.  Apparently, the SSA did as well since it terminated Plaintiff's benefits on the one hand and granted her most recent application for benefits.  Nevertheless, the fact remains that the ALJ failed to properly analyze Dr. Brar's nephrologic opinion apart from the neurologic opinions in the record in order to apply the treating physician rule to his opinion.  The undersigned therefore recommends that the Court remand this case to the ALJ to review Dr. Brar's opinion and

properly apply the treating physician rule.

### B.  RFC LIMITATION CONCERNING EXPOSURE TO PUBLIC AS OPPOSED TO EXPOSURE TO CO-WORKERS

Plaintiff also asserts that the ALJ erred in finding that she could rarely be exposed to physical contact with the general public but could occasionally be exposed to physical contact with coworkers.  ECF Dkt. #15 at 20.  Plaintiff contends that by making such a finding, the ALJ made a medical finding without support as she concluded that exposure to the general public carries a greater risk of infection than exposure to coworkers.  *Id.*

If the Court chooses to accept the undersigned's instant Report and Recommendation, the undersigned recommends that the Court decline to address this issue because the ALJ's analysis may impact her or his findings as to this issue.  *See Reynolds*, 424 Fed. App'x at 417.

### VII.  RECOMMENDATION AND CONCLUSION

Based upon a review of the record, the Statements of Error, and the law, the undersigned recommends that the Court reverse and remand the ALJ's decision for reconsideration of Dr. Brar's opinion and further articulation by the ALJ as to the weight, if any, given to Dr. Brar's opinion.  The undersigned further recommends that the Court suggest that the ALJ obtain an updated opinion from Dr. Brar concerning Plaintiff's conditions since the time periods relevant in the instant case if it would be helpful.

*s/ George J. Limbert*
GEORGE J. LIMBERT
U.S. MAGISTRATE JUDGE

Any OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).